DOUGLAS L. BRUNK, APPELLEE AND CROSS-APPELLANT,
v. NEBRASKA STATE RACING COMMISSION AND
DENNIS OELSCHLAGER, EXECUTIVE SECRETARY
OF NEBRASKA STATE RACING COMMISSION,
APPELLANTS AND CROSS-APPELLEES.

STACY LANE VAN HORN, APPELLEE AND CROSS-APPELLANT,
v. NEBRASKA STATE RACING COMMISSION AND
DENNIS OELSCHLAGER, EXECUTIVE SECRETARY
OF NEBRASKA STATE RACING COMMISSION,
APPELLANTS AND CROSS-APPELLEES.

700 N.W.2d 594

Filed July 22, 2005.   Nos. S-03-698, S-03-699.

Patrick T. O'Brien, of Butler, Galter, O'Brien & Boehm, and Timothy R. Engler and Christopher R. Heinrich, of Harding, Shultz & Downs, for appellants.

David T. Schroeder for appellee Douglas L. Brunk.

O. William VonSeggern for appellee Stacy Lane Van Horn.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

These consolidated appeals involve disciplinary actions brought by the Nebraska State Racing Commission (Commission) against equine veterinarians Douglas L. Brunk and Stacy Lane Van Horn. Following a hearing, the Commission made findings that Brunk and Van Horn had violated Commission rules pertaining to the administration of medications to racehorses and assessed disciplinary penalties. Brunk and Van Horn filed a petition for review in the district court for Lancaster County against the Commission and its executive secretary, Dennis Oelschlager. The district court determined that the evidence did not support some of the Commission's findings and accordingly modified the penalties assessed by the Commission. The Commission and Oelschlager appealed, and Brunk and Van Horn cross-appealed. We consolidated the appeals and now affirm the judgments of the district court, with one modification.

## I. BACKGROUND

Neb. Rev. Stat. § 2-1201.01 (Reissue 1997) requires the Commission "to provide statewide regulation of horseracing in order to prevent and eliminate corrupt practices and fraudulent behavior, and thereby maintain a high level of integrity and honesty in the horseracing industry of Nebraska." The Commission served separate complaints on Brunk and Van Horn, alleging that each violated the rules and regulations of the Commission while licensed and serving as veterinarians during 2001 race meets held at Fonner Park in Grand Island, Nebraska. In January 2002, Brunk and Van Horn each filed objections and motions to dismiss the complaints, alleging that the Commission lacked jurisdiction to proceed because neither Brunk nor Van Horn were at that time licensed "racing industry participants" within the meaning of Neb. Rev. Stat. § 2-1203 (Reissue 1997). The Commission deferred ruling on these objections and motions until the hearing scheduled on the complaints.

The Commission conducted the combined evidentiary hearing on both complaints on September 23 and 24, October 22, and November 25, 2002. Evidence adduced at the hearing disclosed that during the 2001 Fonner Park meets, the Commission utilized Industrial Laboratories Company, Inc. (Industrial Laboratories), of Denver, Colorado, to conduct drug testing on the blood and urine of racehorses. Gas chromatography mass spectrometry tests performed by Industrial Laboratories revealed the presence of "Clonidine," a human blood pressure medication, in 10 horses, 1 of which tested positive for Clonidine on two occasions. The tests conducted by Industrial Laboratories did not include a quantitative analysis of the Clonidine present in the tested blood and urine samples. Veterinarians are permitted to prescribe Clonidine for administration to horses on an "off-label" basis to reduce high blood pressure, as a bronchial dilator to open a horse's airway, or as a medication for nervousness and bleeding in the lungs. Although veterinarians are permitted to prescribe Clonidine for racehorses, it is classified as a "Class 3" drug by the Association of Racing Commissioners International, Inc., and as such, may not be administered to or present in a horse on a day when it races.

The horses that tested positive for Clonidine at Fonner Park were all treated by either Brunk or Van Horn, both of Equine Veterinary Associates, P.C. (Clinic), a veterinary clinic located near the racetrack. Brunk prescribed Clonidine for eight of the horses, including Rust Ridge Range, Coronary Clare, Personal Trick, Trinity River, Pago, Jana's Fantasy, Cure the Devil, and High Dice. Van Horn prescribed the drug for the other two horses, Hesaluckycat and Vengeful Vicky.

The Commission's investigation revealed that the Clinic ordered 400 Clonidine pills on September 25, 2000, and 500 pills on March 29, 2001. The second order took place after the positive test results were reported. Between August 23 and September 29, 2000, the Clinic ordered 3,000 milliliters of liquid Clonidine at a .2 milligram concentration, and between October 2, 2000, and March 12, 2001, it ordered 2,800 milliliters of liquid Clonidine at a .8 milligram concentration.

Commission investigators found Clonidine pills in the possession of the trainers of 6 of the 10 horses. Two other trainers had

also received Clonidine pills from one of the veterinarians. Four trainers were granted immunity in exchange for their truthfulness during interviews regarding the investigation. All but one of the trainers whose horses were prescribed Clonidine testified that Brunk or Van Horn told them that they could not administer the drug within 48 hours of a race. The other trainer testified that he had not received Clonidine and had no knowledge of its use. Some trainers testified that the veterinarians had given nonprohibited injections of "Bute" or "Lasix" within 24 hours of a race, but no trainer ever indicated that the veterinarians had administered injectible doses of Clonidine. All of the trainers whose horses tested positive for Clonidine were disciplined pursuant to 294 Neb. Admin. Code, ch. 18, § 18.011 (2001).

Van Horn's treatment records indicated that in 59 of 60 cases, he had given Clonidine for treatment of a horse the day after it had raced. However, in several instances, the treatment time reported was at a time that the horse had already left the park. Brunk's medication reports also contained irregularities when compared with the bills provided by the Clinic, and some prescriptions that trainers had reportedly received from Brunk or Van Horn did not appear on the medication reports of either veterinarian.

Following the hearing, the Commission entered orders finding that Brunk and Van Horn had violated various rules of the Commission and assessed discipline. The Commission determined that Brunk had violated 294 Neb. Admin. Code, ch. 14, § 14.005.06 (2001), by causing Clonidine to be administered to eight horses on race days on nine occasions and that he was responsible for the presence of Clonidine in those horses in violation of § 18.011.01. It further determined that Van Horn caused Clonidine to be administered to two horses on a race day and was responsible for the presence of the drug in those horses. The Commission also determined that Van Horn had violated Commission rules by administering "Dex" and estrogen to horses on race days without permission and that Brunk had violated a rule requiring persons licensed by the Commission to cooperate in its investigation of alleged rule violations. In addition, the Commission found that each veterinarian had violated the Commission's rules regarding drug handling, packaging, and

reporting. It determined that each veterinarian would be ineligible for licensing by the Commission, be denied access to all areas under its jurisdiction until January 1, 2006, and be assessed fines in the amount of $2,000.

Brunk and Van Horn appealed to the district court pursuant to the Administrative Procedure Act. The court rejected their contention that the Commission lacked jurisdiction to assess discipline after their licenses had expired at the end of 2001. Based upon a de novo review, the district court affirmed the findings of the Commission that Brunk failed to properly handle, package, and report medications given to horses and that he failed to file reports in a timely fashion. However, it determined that there was insufficient evidence to support the Commission's determination that Brunk had failed to cooperate with the Commission during its investigation. The court also determined that there was insufficient evidence to establish that Brunk caused Clonidine to be administered to any horses on race days or that he was responsible for such administration. With respect to Van Horn, the district court affirmed the Commission's finding that he had violated rules regarding drug handling, packaging, and reporting, but found the evidence insufficient to establish other charges, including those pertaining to unlawful administration of Clonidine and two other drugs. The district court also found the evidence insufficient to support the Commission's findings that Van Horn had administered Dex and estrogen in violation of Commission rules. On the basis of these findings, the court did not modify the fines assessed by the Commission but did modify the penalties assessed by shortening Brunk's period of disqualification from licensure to July 1, 2004, and Van Horn's to July 1, 2003. The Commission and Oelschlager perfected these timely appeals and moved for consolidation, which was granted. On our own motion, we moved the consolidated appeals to our docket pursuant to our authority to regulate the caseloads of the appellate courts of this state. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## II. ASSIGNMENTS OF ERROR

The Commission and Oelschlager assign, regrouped and restated, that the district court erred (1) in finding the evidence

insufficient to establish that Brunk and Van Horn were responsible for the presence of Clonidine in horses on race days; (2) in finding the evidence insufficient to establish that Brunk and Van Horn had administered a prohibited drug or medication on race days; (3) in finding the evidence insufficient to establish that Brunk failed to cooperate in the investigation; (4) in modifying the penalties imposed by the Commission; and (5) in making several incorrect factual determinations which cumulatively resulted in "erroneous failure to credit the Commission's observation of the witnesses and the conclusions the Commission reached."

In their cross-appeals, Brunk and Van Horn assign, restated and renumbered, that the district court erred (1) in finding that the Commission had jurisdiction and (2) in imposing penalties that are not authorized by the Nebraska statutes governing horseracing in Nebraska. Additionally, Van Horn assigns that the district court erred in finding that he violated the Commission's recording and reporting rules.

## III. STANDARD OF REVIEW

A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. *Zwygart v. State, ante* p. 41, 699 N.W.2d 362 (2005); *Nebraska Liq. Distrib. v. Nebraska Liq. Cont. Comm.*, 269 Neb. 401, 693 N.W.2d 539 (2005). When reviewing an order of the district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* In an appeal under the Administrative Procedure Act, an appellate court will not substitute its factual findings for those of the district court where competent evidence supports the district court's findings. *Nebraska Liq. Distrib. v. Nebraska Liq. Cont. Comm., supra*; *DLH, Inc. v. Nebraska Liquor Control Comm.*, 266 Neb. 361, 665 N.W.2d 629 (2003). When reviewing a question of law, an appellate court reaches a conclusion independent of the district court's ruling. *Zwygart v. State, supra*; *In re Grand Jury of Lancaster Cty.*, 269 Neb. 436, 693 N.W.2d 285 (2005).

## IV. ANALYSIS

### 1. JURISDICTION OF COMMISSION

The Commission is authorized to issue licenses to "racing industry participants" and "other persons as deemed necessary by the commission." Neb. Rev. Stat. § 2-1203.01(2) (Reissue 1997). "If the commission is satisfied that its rules and regulations and all provisions of sections 2-1201 to 2-1218 have been and will be complied with, it may issue a license for a period of not more than one year." Neb. Rev. Stat. § 2-1205 (Reissue 1997). Pursuant to this statutory authority, the Commission has promulgated the following rule:

> The Commission may refuse to issue or renew a license, or may suspend or revoke a license issued pursuant to the rule, if it shall find that the applicant, or any person who is a partner, agent, employee or associate of the applicant, has been convicted of a crime in any jurisdiction, or is or has been associating or consorting with bookmakers, touts, or persons of similar pursuits, or has personally engaged in similar pursuits, or is financially irresponsible, or has been guilty of or attempted any fraud . . . *or has violated or attempted to violate* any law with respect to racing in any jurisdiction *or any rule, regulation or order of the Commission*, or adopted by the Commission, or has been guilty of or engaging in similar, related or like practices.

(Emphasis supplied.) 294 Neb. Admin. Code, ch. 10, § 10.004 (2001). "Every license shall be for not more than one year, and shall expire on December 31st of each year." 294 Neb. Admin. Code, ch. 10, § 10.013 (2001).

The Commission has statutory authority to "revoke or suspend licenses issued to racing industry participants" and may also impose a fine of up to $1,000 "upon a finding that a rule or regulation has been violated by a licensed racing industry participant." § 2-1203. Neb. Rev. Stat. § 2-1244 (Reissue 1997) defines "horseracing industry participant," for purposes of Neb. Rev. Stat. §§ 2-1243 to 2-1246 (Reissue 1997), as "an individual who currently holds a valid license from the State Racing Commission and who owns, trains, cares for, or rides horses stabled at a Nebraska-licensed racetrack for the purpose of horseracing at the live race meeting at such racetrack." The Commission has incorporated

this definition for purposes of its general rulemaking and jurisdictional authority in 294 Neb. Admin. Code, ch. 2, § 2.001.06(2)A and B (2001). The Commission's rules provide: "Each license is granted upon the condition that the licensee shall accept the jurisdiction of the Racing Commission or its authorized designee to conduct hearings and impose sanctions pursuant to Rule 7.002 and each licensee in accepting a license does thereby consent thereto." § 2.001.06(2)B(2). Pursuant to its licensing authority, the Commission requires that "[e]very veterinarian who examines or treats a horse registered for racing at the Racing Secretary's office, at a licensed meeting then in progress, must be licensed by the Nebraska State Racing Commission." 294 Neb. Admin. Code, ch. 14, § 14.005.01 (2001). Licensure by the Commission is in addition to state licensing requirements for veterinarians. See Neb. Rev. Stat. § 71-1,152.01 et seq. (Reissue 2003).

Brunk and Van Horn were licensed by the Commission at all relevant times during 2001, but were not licensed by the Commission in 2002. In their cross-appeals, they contend that the Commission had no jurisdiction to conduct disciplinary proceedings against them in 2002 for rule violations alleged to have occurred in 2001. They argue that because they were not licensed in 2002, they were not "racing industry participants" subject to the Commission's disciplinary authority during that year. They further contend that the Commission has no statutory authority to declare them ineligible for licensure for any specific period.

An administrative body has no power or authority other than that specifically conferred by statute or by construction necessary to accomplish the plain purpose of the act. *Slansky v. Nebraska State Patrol*, 268 Neb. 360, 685 N.W.2d 335 (2004); *Ventura v. State*, 246 Neb. 116, 517 N.W.2d 368 (1994). An administrative agency may not employ its rulemaking power to modify, alter, or enlarge provisions of a statute which it is charged with administering. *City of Omaha v. Kum & Go*, 263 Neb. 724, 642 N.W.2d 154 (2002); *Spencer v. Omaha Pub. Sch. Dist.*, 252 Neb. 750, 566 N.W.2d 757 (1997); *Clemens v. Harvey*, 247 Neb. 77, 525 N.W.2d 185 (1994). The Commission is charged by statute with providing "statewide regulation of horseracing in order to prevent and eliminate corrupt practices and fraudulent behavior, and thereby maintain a high level of integrity and hon-

esty in the horseracing industry of Nebraska." § 2-1201.01. Clearly, the Commission's rules governing the administration of drugs and medicines to racehorses are in furtherance of this statutory purpose. The question presented is whether the procedure utilized by the Commission to enforce such rules is within its statutory authority.

We conclude that it is. The statutory requirement that licenses be issued for a period of no longer than 1 year requires the Commission to reevaluate the qualifications of veterinarians and other persons involved in Nebraska horseracing on a regular and recurring basis. Before issuing a license, the Commission must be satisfied that its rules and regulations as well as applicable statutes "have been and will be complied with." § 2-1205. There is no statutory limitation on the right of a person to apply for relicensure after a license has expired. Because a relicensure decision would involve a consideration of any rule violations during prior periods of licensure, it is reasonable and consistent with the Commission's statutory purpose to promptly investigate and resolve alleged rule violations committed during a period of licensure, even if the process of doing so extends into a period when the subject is not licensed. See *Wang v. Board of Registration in Medicine*, 405 Mass. 15, 537 N.E.2d 1216 (1989). Likewise, because relicensure involves a consideration of prior rule violations, the Commission has authority to determine that a person who has violated its rules will not be eligible for relicensure for a specified period. We agree with the district court that the Commission had jurisdiction in this matter.

## 2. "Causing" Drugs to Be Administered

### (a) Brunk

The Commission found that as the veterinarian in charge of the care of the eight racehorses listed above, Brunk caused Clonidine to be administered to those horses on race days "when no emergency existed and without first getting the permission of the official track veterinarian within 24 hours of first post time during a race meet held at Fonner Park in violation of Rule 14.005.06 of the Nebraska Rules of Racing." Section 14.005.06 provides:

> Except in cases of extreme emergency, all practicing veterinarians must get permission from the official track veterinarian before medicating a horse within 24 hours of first post time on a day it is entered to race. In cases of medication of a horse in extreme emergency, the official track veterinarian and the stewards shall be immediately advised of the circumstances necessitating such treatment and of the medication administered. The permission requirement is waived for the authorized administration of furosemide.

Based upon its de novo review, the district court found the evidence insufficient to support this finding. The Commission assigns that this was error.

It is undisputed that horses for which Brunk had prescribed Clonidine tested positive for that substance on race days. The dispute, with respect to the alleged violation of § 14.005.06, is whether Clonidine was in fact administered to the horses on race days and, if so, whether Brunk administered it. No one testified that he or she observed Brunk or anyone else administer Clonidine to any horse on a day that it raced. All but one of the trainers whose horses tested positive for Clonidine acknowledged receiving the drug in pill form and administering it no closer in time than 48 hours before a race; the remaining trainer disclaimed any knowledge regarding Clonidine.

There was conflicting and inconclusive evidence as to whether the positive test results could have been due to residual Clonidine in a horse's system from a prescribed administration more than 48 hours prior to a race. After obtaining the initial positive results, Industrial Laboratories contacted its scientific consultant, Dr. Richard Sams, a professor of veterinary medicine at Ohio State University and director of the official testing laboratory of the Ohio State Racing Commission. At Industrial Laboratories' request, Sams conducted tests on urine samples taken from the horses running at Fonner Park which produced the positive test results. At the time of Sams' initial testing, there were no standard operating procedures utilized in testing for Clonidine in racehorses. Sams testified that he detected the presence of Clonidine in nearly all of the samples sent from Industrial Laboratories. However, he was not asked to render an opinion regarding the

time, method, or amount of Clonidine administered to the horses in question.

Sams testified that after conducting these initial tests, he asked a colleague at the University of California at Davis (UC-Davis) to do a study on orally administered Clonidine in test horses. She reportedly administered Clonidine as Sams instructed and sent him back, for testing, urine samples taken from five stabled research horses ages 5 to 16 years. One UC-Davis sample yielded no result for measurable Clonidine. Of the other four, two showed measurable amounts of Clonidine only at 1- and 2-hour intervals after oral administration of the drug. Sams concluded that in these horses, Clonidine could not be detected past the 4-hour interval. However, he acknowledged that there can be dramatic differences in excretion rates of drugs into urine over time between horses and that the more similar the characteristics of the test horses, the less chance of uncertainty as to the variables affecting excretion. Sams further acknowledged that acidification of urine due to exercise could affect excretion of certain drugs but that the research he referred to did not involve any horses exercised extraneously.

Dr. Steven Barker, an employee of Louisiana State University and a chemist for the Louisiana State Racing Commission, testified on behalf of Brunk. Barker served as an advisor to the Association of Racing Commissioners International and participated in the development of its drug classification system for racehorses. Barker testified, based upon his familiarity with the evidence in this case, that it was impossible to draw any conclusion about when, where, and how much Clonidine was administered to the Fonner Park horses. He testified that the information derived from the UC-Davis tests, conducted on "horses standing in stalls," had "no relevance to what might have been found in racing fit horses [sic] that had just completed a race." Baker stated an opinion that the positive test results at issue could have been due to the administration of Clonidine by trainers more than 48 hours prior to a race, in accordance with Brunk's instructions. We find no error in the district court's de novo determination that the evidence was insufficient to establish that Brunk caused Clonidine to be administered to any racehorse on any race day.

## (b) Van Horn
### (i) Clonidine

The Commission found that as the veterinarian in charge of the care of the two racehorses listed above, Van Horn caused Clonidine to be administered to those horses on a race day "when no emergency existed and without getting the permission of the official track veterinarian within 24 hours of the first post time during a race meet held at Fonner park in violation of Rule 14.005.06 of the Nebraska Rules of Racing." The district court determined, on the basis of its de novo review, that the evidence was insufficient to support this finding. For the same reasons discussed in connection with the district court's similar finding with respect to Brunk, we find no error in this determination.

### (ii) Dex and Estrogen

The Commission found that Van Horn had injected one horse running at Fonner Park with Dex and another with estrogen prior to their scheduled races, in violation of § 14.005.06. Based upon its de novo review, the district court determined that the evidence was insufficient to support these findings. Although the Commission's second assignment of error is broad enough to refer to this determination, it is not argued in the Commission's brief, and we therefore do not consider it. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party assigning the error. *In re Petition of Omaha Pub. Power Dist.*, 268 Neb. 43, 680 N.W.2d 128 (2004).

### 3. "Responsibility" for Administration of Drugs

The Commission determined that Brunk and Van Horn were responsible for the presence of Clonidine in horses on race days, in violation of § 18.011.01. The applicable rules provide:

**18.011** The trainer is the absolute insurer of the condition of horses entered in an official workout or race and is responsible for the presence of any prohibited drug or medication, or other prohibited substance in such horses. A positive test for a prohibited substance, or the presence of permitted medication in excess of maximum allowable levels, as reported by an official laboratory approved by the

commission shall be prima facie evidence of a violation of this rule.

**18.011.01** Owners, assistant trainers, grooms, practicing veterinarians, or any other persons who cared for, or attended the horse may also be held responsible for any violation of this rule and be subject to the same penalties as the trainer.

The district court determined that the evidence was insufficient to support this finding. The Commission and Oelschlager argue on appeal that because of the uncontroverted evidence that Brunk and Van Horn prescribed Clonidine for the horses in question, they are necessarily responsible for the horses' testing positive for Clonidine on race days.

Section 18.011.01 treats the trainer as the "absolute insurer" of the condition of a horse on race day and states that the trainer "is responsible" for the presence of any prohibited substance in the horse. Others, including veterinarians, "may also be held responsible" under § 18.011.01. The differentiation between trainers and others with respect to responsibility for the presence of a prohibited substance in a horse is significant. Trainers are held to the equivalent of a strict liability standard, making them responsible for the presence of a prohibited substance, regardless of their personal knowledge or conduct with respect to the substance. Because the rule does not impose this strict standard on others, including veterinarians, we interpret the rule as requiring proof that such persons engaged in specific conduct which resulted in the positive test result in order to be held "responsible."

As noted, we find no error in the district court's finding that the evidence is insufficient to establish that either Brunk or Van Horn personally administered Clonidine to the horses in question on race days. Although the record establishes that both veterinarians prescribed the drug for racehorses with instructions that it not be given within 48 hours of a race, there was inconclusive evidence as to when, how, and by whom the drug was administered prior to each horse's race. Sams testified that the UC-Davis study which he requested found detectable levels of Clonidine in the urine of the test horses 2 hours after oral administration, but no detectable level of Clonidine was found in tests performed more than 4 hours after administration. Sams did not express any opinion regarding the administration time or elimination rate of

the Clonidine detected in the horses at Fonner Park. Barker testified that it would be impossible to draw any conclusion about when, where, how, and how much Clonidine was administered to those horses. Based on this record, we conclude that the district court did not err in finding the evidence insufficient to establish that Brunk and Van Horn were responsible for the positive test results in the Fonner Park horses.

### 4. COOPERATION WITH COMMISSION INVESTIGATION

The Commission found that Brunk failed to cooperate with its investigation because he did not provide investigators complete and accurate reports as well as "all purchased, administration and dispensing records for the drug Clonidine," thus requiring the Commission to issue subpoenas in order to secure the records. The Commission found Brunk's conduct in this regard to be in violation of 294 Neb. Admin. Code, ch. 2, § 2.001.07A(1) (2001), which states in relevant part:

Each license granted by the Racing Commission, including licenses to . . . veterinarians, is granted upon the condition that the licensee shall cooperate with the stewards and Racing Commission investigators or enforcement officers in rules investigations conducted by them; and each licensee in accepting a license does thereby consent thereto.

The district court determined that the evidence was insufficient to conclude that Brunk refused to provide records requested for those horses within the jurisdiction of the Commission. The court found that Brunk had "provided the Commission with records of horses that tested positive and records of Clonidine purchased during the period the Commission requested."

The record reflects that by letter dated November 6, 2001, Dan Sweetwood, the Commission's director of investigations and security, requested Brunk to produce various records maintained by the Clinic pertaining to Clonidine purchased or prescribed between January 1, 2000, and November 12, 2001. A subsequent letter from Oelschlager included more details regarding the information sought and requested that it be submitted by December 14, 2001. In a letter addressed to Sweetwood dated December 13, 2001, Brunk stated: "This is to inform you that, as of yet, I have been unable to get my records together for you. I will give it my

immediate attention as soon as I possibly can." Sweetwood testified that he was attempting to secure from Brunk as much information as he could regarding his use and distribution of Clonidine at Fonner Park in 2001 but that Brunk never provided the information requested. The Commission issued a subpoena directed to Brunk and the Clinic on February 14, 2002, in which it requested various records pertaining to Clonidine purchased and prescribed between January 1, 2000, and April 1, 2001. Brunk moved to quash the subpoena on various grounds. On May 10, 2002, the Commission overruled the motion to quash and directed Brunk to comply with the subpoena. Without specific citation to the record, the Commission states in its brief that Brunk refused to comply with the subpoena. In his brief, Brunk states that the "Commission had all the records of [the Clinic] for Clonidine billed that was dispensed for horses that tested positive." Brief for appellee Brunk at 24. However, he does not state that he provided these documents, and the record reflects that Commission investigators obtained the documents from trainers.

Brunk did not testify at the hearing or offer any evidence that he provided *any* of the documents requested by the Commission during its investigation. Based on the uncontroverted testimony of Sweetwood that Brunk failed to cooperate with the requests to produce records relating to Clonidine, we conclude that there was no competent evidence to support the district court's finding that Brunk cooperated with the Commission's investigation in compliance with § 2.001.07A(1).

### 5. Drug Handling, Packaging, and Reporting: Van Horn

The Commission found that both Brunk and Van Horn violated its rules pertaining to the handling, packaging, and reporting of drugs prescribed for racehorses. Based upon its de novo review, the district court found these findings were supported by the evidence. With respect to Van Horn, the district court stated:

> Van Horn failed to make certain entries on his daily medication reports, he did not provide all of the required information, he failed to report drugs prescribed, he did not properly report the prescription of Guenabenz, and he gave Clonidine to trainer Dale Brecheisen in a plastic bag.

In his cross-appeal, Van Horn assigns that this finding was erroneous. Brunk has not cross-appealed on this issue.

The Commission found that Van Horn violated 294 Neb. Admin. Code, ch. 14, §§ 14.005.02 to 14.005.02C and 14.005.03 (2001), which provide:

> **14.005.02** All veterinarians shall make reports to the Commission concerning each horse examined or treated; each prescription written; and drugs, medicines, or vitamins provided for administration by trainers or owners. Reports shall be made to the Commission no later than 2 p.m. the following race day. A signed copy of the veterinarian's own record may serve as the veterinarian's official report, or the report may be submitted on forms provided by the Commission.
>
> **14.005.02A** The veterinarian's report shall include the:
>
> (1) name of each horse examined or treated;
>
> (2) owner and/or trainer of the horse;
>
> (3) name and amount of all drugs, medicines, or vitamins administered;
>
> (4) time and method of administration.
>
> **14.005.02B** If drugs, medicines, or vitamins are prescribed, or provided by the veterinarian, to be administered by the owner or trainer the report shall specify the:
>
> (1) name of the owner or trainer;
>
> (2) name of the horse(s) for which the prescription is provided;
>
> (3) name of the drug, medication, or vitamin; and time(s) for and other instructions concerning administration.
>
> **14.005.02C** Veterinarian reports shall be provided beginning not later than the first day that entries are taken. Reports must also include horses that are entered and draw into a race that were treated or administered drugs, medications, or vitamins or for which drugs, medications, or vitamins have been provided or prescribed for use by the trainer, during the fourteen day period prior to the race, if the treatment or administration occurred prior to the date that [sic] for which daily submission of veterinarian reports is required.
>
> . . . .

**14.005.03** Any drugs, medications, or vitamins provided by a veterinarian for use by a trainer on any horses that are on the grounds of the association, or that are registered to race, shall be in containers clearly labeled to identify the substance provided, the horse or horses for which it is provided, and instructions concerning administration.

Trainer Dale Brecheisen testified that Van Horn gave him five or six Clonidine tablets in a plastic bag, not a pill bottle, for administration to one of his horses running at Fonner Park in 2001. Van Horn's report shows that this occurred at 4 p.m. on March 26, 2001. Brecheisen testified that it occurred on the previous day, just before he left town with the horse. There were other instances where Van Horn reported treatments administered in Grand Island to horses which were not there on the dates indicated. In his reports, Van Horn utilized a "treatment code 263" to indicate a prescription of "blood pressure pills." From this designation, it could not be determined whether the prescription was for Clonidine or "Guanabenz." Van Horn admitted that he prescribed medication for a horse named "Gifted Guy" at a time when the horse was in Oklahoma but registered to race in Nebraska and that he did not report the prescription. From our review of the record, we conclude that there was competent evidence upon which the district court could conclude that Van Horn violated §§ 14.005.02 to 14.005.02C and 14.005.03, as initially determined by the Commission.

### 6. CUMULATIVE ERROR

The Commission and Oelschlager assign that the district court "erred in several factual determinations set forth in the Court's opinion, the cumulation [sic] of which resulted in erroneous failure to credit the Commission's observation of the witnesses and the conclusions the Commission reached." We have considered this assignment and the accompanying argument set forth in the Commission and Oelschlager's brief and find them to be without merit.

### 7. PENALTIES

After making its de novo findings, the district court concluded, with respect to the penalties to be assessed:

The integrity of racing is dependent upon veterinarians who properly and carefully maintain accurate records of drugs administered to race horses. Dr. Brunk's records are terrible. They reflect a gross disregard for Commission rules. More importantly, they reflect an unwillingness to recognize that such shoddy record keeping calls into question the integrity of horse racing in Nebraska, not to mention Dr. Brunk's own veracity. The Commission has the authority and responsibility to insist upon compliance – even meticulous compliance – with its reporting requirements. . . .

Dr. Van Horn's records are not nearly as abysmal as Dr. Brunk's. The improper and incomplete records are not insignificant, though.

The court finds that the Commission does have the authority to extend certain discipline to periods of time that are beyond the duration of the license issued. Therefore, the court finds that the Commission's penalty should be modified by reducing the time that the plaintiff's [sic] are banned from any area under the jurisdiction of the Nebraska State Racing Commission. The fine for each shall remain in effect.

Based upon this reasoning, the district court determined that Brunk would be ineligible for licensing by the Commission and would be denied access to all areas under the jurisdiction of the Commission until July 1, 2004, and that Van Horn would be similarly ineligible for licensing and denied access until July 1, 2003. As noted, the district court did not modify the fines assessed by the Commission.

The Commission and Oelschlager assign error with respect to the penalty modification, arguing that the court acted arbitrarily and capriciously in reducing the penalties. Brunk and Van Horn assign error in the cross-appeals, arguing that the penalties as determined by the district court were disproportionate to the seriousness of the offenses, the economic consequences of disqualification from licensure, and the penalties which the Commission assessed against the trainers whose horses tested positive for Clonidine. We conclude that the penalties assessed by the district court are proportionate to the seriousness of the offenses committed by Brunk and Van Horn, with one exception. Because we have determined that the district court erred in setting aside the

Commission's finding that Brunk failed to comply with its rule requiring cooperation in a rules investigation, we conclude that the period of his disqualification for licensure should be extended by 6 months, to January 1, 2005.

## V. CONCLUSION

The district court correctly determined that the Commission acted within its jurisdiction and authority in pursuing disciplinary actions against Brunk and Van Horn for rule violations alleged to have occurred during 2001, notwithstanding the fact that they were not licensed by the Commission when the disciplinary actions were concluded in 2002. In conducting its review de novo on the record, the district court did not err in determining there was insufficient evidence to establish that Brunk and Van Horn caused Clonidine to be administered to racehorses on race days or that they were responsible for positive test results. Likewise, the district court did not err in finding that there was sufficient evidence to establish that both Brunk and Van Horn violated the Commission's rules pertaining to the handling, packaging, and reporting of drugs prescribed for racehorses. We conclude that the district court did err in finding the evidence insufficient to support the Commission's determination that Brunk violated its rule requiring a licensee to cooperate with an investigation conducted by the Commission. Based upon this determination, we extend the period during which Brunk is ineligible for licensing by the Commission and denied access to all areas under the jurisdiction of the Commission to January 1, 2005. Accordingly, the judgment in case No. S-03-698 is affirmed as modified, and the judgment in case No. S-03-699 is affirmed.

JUDGMENT IN NO. S-03-698 AFFIRMED AS MODIFIED.
JUDGMENT IN NO. S-03-699 AFFIRMED.